IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Elizabeth Sanders,                    :

          Plaintiff,                  :

     v.                               :     Case No. 2:14-cv-0249

                                      :     JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social Security,            Magistrate Judge Kemp

          Defendant.                  :

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Elizabeth Sanders, filed this action seeking
review of a decision of the Commissioner of Social Security
denying her applications for disability insurance benefits and
supplemental security income.  Those applications were filed on
January 13, 2011, and alleged that Plaintiff became disabled on
November 17, 2009.

After initial administrative denials of her claim,
Plaintiff was given a video hearing before an Administrative Law
Judge on September 18, 2012.  In a decision dated October 15,
2012, the ALJ denied benefits.  That became the Commissioner's
final decision on February 5, 2014, when the Appeals Council
denied review.

After Plaintiff filed this case, the Commissioner filed the
administrative record on May 23, 2014.  Plaintiff filed her
statement of specific errors on August 11, 2014, to which the
Commissioner responded on October 20, 2014.  No reply brief has
been filed, and the case is now ready to decide.

II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 29 years old at the time of the
administrative hearing and who has a high school education plus
three years of college, testified as follows.  Her testimony

appears at pages 35-60 of the administrative record.

Plaintiff last worked as an accounts clerk, a job she obtained through a temporary services agency. That job did require some walking as well as lifting heavy boxes. She also did data entry and worked with various vendors. Through the same temporary agency, she had previously obtained work at a car dealership as a service advisor. Plaintiff had done assembly-line work as well, and she had held part-time jobs while attending college.

In 2010, Plaintiff fell on the ice and injured herself. She was subsequently prescribed a cane because she kept falling. She had been told that she needed a spinal fusion but her neurosurgeon would not operate due to her young age.

Plaintiff was able to drive herself to doctors' appointments but it was painful. She testified that after her first back injury, which was in 2009, she got worse from both physical therapy and steroid injections. The pain starts in her low back and radiates up her right side and into her legs. After treatment for her back failed, she began to experience depression. She described regular thoughts of suicide and difficulty getting out of bed. She was able to visit with family, though.

In terms of walking, Plaintiff said that she could only walk for five to ten minutes before stopping. On a typical day, after taking her medication, Plaintiff would do some light housework, but it took a long time to accomplish anything. She constantly changed positions from sitting to standing. Her medications caused drowsiness and she usually slept at some point during the day for two or three hours. One of her medications also caused her legs to swell. She could sit for about twenty minutes but would then have to lie down. She was able to read and watch television, but either her pain or her medications affected her

-2-

ability to concentrate.

### III. The Medical Records

The medical records in this case are found beginning on page 346 of the administrative record. The pertinent records - those relating to the issues raised in the Statement of Errors - can be summarized as follows.

Plaintiff underwent physical therapy for back pain from November 24, 2009 to January 14, 2010. During the course of therapy, her back pain and radicular symptoms increased. The therapist therefore recommended further testing by a physician. (Tr. 350). She was then seen by Dr. Batra, who reviewed some MRI results and who noted that she walked with a slightly antalgic gait and showed some decrease in the range of motion of the lumbar spine. Dr. Batra's impression was lumbar radiculitis and spondylosis as well as internal disk derangement; steroid injections were recommended. (Tr. 379-80). At least two were subsequently performed, which, according to a note from Dr. Bonasso, significantly aggravated Plaintiff's symptoms. A subsequent EMG which Dr. Bonasso ordered showed either a right S1 radiculopathy or sciatica. (Tr. 394-95). Dr. Bonasso also noted in his April 10, 2010 note that Plaintiff's examination was "completely intact," but he did give her an off-work slip for another month. (Tr. 398). He characterized the findings of the EMG as "mild" but noted that she had a broad-based bulge at L4-L5. (Tr. 399). A subsequent note stated that she had no instability based on flexion and extension x-rays and that Dr. Bonasso did not think, at that time, that surgery was indicated. (Tr. 400).

On June 8, 2011, Plaintiff was seen by Dr. Swearingen for purposes of a psychological evaluation. At the time, she was taking medication for depression. She was not working due both to being laid off and to problems with her back. She was able to

-3-

do household chores, watch television, read, and socialize with friends.  Her affect was reactive but her prevailing mood was depressed and anxious.  She reported crying spells and had recurrent thoughts of death or suicide.  Her concentration and persistence were good and she had no difficulty following instructions.  Dr. Swearingen diagnosed a major depressive disorder and rated her GAF at 60.  He concluded that Plaintiff had no limitations in any areas of work-related functioning. (Tr. 609-13).

Plaintiff was treated by Dr. Desai for depression beginning in July of 2011.  In his initial evaluation, he reported that she had been struggling with chronic back pain for two years and that she walked with a cane.  He noted signs of moderate depression including a sad demeanor and depressed thought content.  Her speech and thinking were slowed by her depressed mood.  Dr. Desai diagnosed major depressive disorder, moderate, and rated Plaintiff's GAF at 55.  He increased or continued her medications.  (Tr. 680-81).  A follow-up note from a month later showed that she was doing well and her mood at that time was entirely normal.  (Tr. 682-83).  She did report panic attacks in 2012, but Dr. Desai's diagnosis and GAF rating did not change at that time.  (Tr. 911).  Later progress notes from 2012 are similar in content.

A discogram was done on Plaintiff's low back on October 11, 2011.  It showed a grade 5 annular tear at the L5-S1 level with posterior disk bulge.  (Tr. 860-61).  Dr. Brown then did a consultative physical examination and reported on November 22, 2011, that Plaintiff said she fell and tore one of her herniated discs in December, 2010, and that her discogram showed that tear.  She was awaiting the results of another MRI.  Plaintiff reported pain in her back and pain and weakness in her right leg.  She weighed 307 pounds on the date of the exam.  She walked with an

-4-

antalgic gait, dragging her right leg behind her, and carried a cane but could walk without it. There was increased lumbar lordosis and straight leg raising was positive bilaterally in the supine position. She had abnormal neurological findings in the right leg. She could squat but with difficulty. Dr. Brown's assessment was chronic low back pain, and she thought Plaintiff would be mildly impaired in bending, stooping, lifting, walking, crawling, squatting, carrying, traveling, and pushing and pulling heavy objects. (Tr. 862-66). The MRI referred to by Dr. Brown was interpreted by Dr. Bonasso as showing no changes. He thought she would benefit from weight loss and physical therapy. (Tr. 896).

Dr. Singh, Plaintiff's treating physician, completed a residual functional capacity questionnaire on November 11, 2011. He said that Plaintiff had good and bad days and that her anxiety and depression affected her pain. He also thought pain would often affect her concentration. Dr. Singh concluded that Plaintiff could not walk a block without rest or severe pain, could not sit for more than thirty minutes or stand more than ten minutes at a time, and could do neither for more than two hours a day. She would also need to lie down at unpredictable intervals and use a cane. She could lift up to ten pounds occasionally, could not bend or twist at the waist, and would miss work three days per month due to her pain. (Tr. 880-84).

Dr. Desai was also asked to rate Plaintiff's mental residual functional capacity. He rated the severity of her impairment in multiple areas, concluding that she was seriously limited in many of those areas and unable to meet competitive standards in at least sixteen categories of work activities. He also thought she would miss at least four days of work per month due to symptoms from her psychological impairments. (Tr. 913-18).

Finally, Plaintiff's functional capacity was evaluated by

-5-

state agency reviewers.  From a physical standpoint, Dr. McCloud
said, on May 2, 2011, that Plaintiff could do a fairly wide range
of light work, including occasionally climbing ladders, ropes,
and scaffolds.  (Tr. 78-79).  Dr. Freihofner, on December 6,
2011, disagreed to some extent, limiting Plaintiff to standing or
walking for no more than three hours in a workday and also
imposing a number of other restrictions including no work around
hazards or unprotected heights.  (Tr. 103-05).  From a
psychological standpoint, Dr. Voyten concluded, on June 15, 2011,
that Plaintiff's affective disorder was not severe.  (Tr. 86-87).
Dr. Edwards later concurred in that opinion, based on records
which appear to conclude with Dr. Desai's office note of August
17, 2011.  (Tr. 115-16).

IV.  <u>The Vocational Testimony</u>

Robert Brezinski was the vocational expert in this case.
His testimony begins on page 61 of the administrative record.

Mr. Brezinski testified that Plaintiff's past work was best
described as an administrative clerk, a light, semi-skilled job,
and as an auto assembler, a medium, unskilled job.  The clerk job
had transferable skills including knowledge of office procedures
and operation of office equipment.

He was then asked some questions about a hypothetical person
who could work only at the sedentary exertional level and who
could not climb ladders, ropes, or scaffolds, or work around
unprotected heights and hazardous machinery.  The person could
also occasionally climb ramps and stairs and could frequently
balance and occasionally stoop, kneel, crouch, or crawl.
Finally, the person had to avoid concentrated exposure to
excessive vibration.  According to Mr. Brezinski, someone with
those limitations could not do Plaintiff's past work, but he or
she could work as a clerical sorter, telephone answering server,
or final assembler in the optical goods area.  He gave numbers

-6-

for those jobs in the State and national economies.

Mr. Brezinski was then asked how a need to change positions at will would affect the ability to do those jobs.  That limitation, he said, would eliminate the first two and reduce the numbers of assembler jobs available.  However, someone so limited could also work as a surveillance system monitor or film touch up inspector.  Someone who needed to use a cane while walking could not do the clerical sorter job, but could do the last three jobs which Mr. Brezinski described.

Lastly, Mr. Brezinski was asked if a person who could not sit or stand for more than two hours in a workday, or who would miss at least three days of work per month, could be employed competitively.  He did not think so.  He also testified that being off task more than two or three minutes per hour in addition to regular work breaks was not consistent with sustained employment, nor was lying down two to three hours per day during the workday.

V.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 14-23 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2013.  Next, he found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of November 17, 2009.  Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including degenerative disc disease of the lumbar spine and obesity.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

-7-

Moving to the step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary exertional level, but she could not climb ladders, ropes, or scaffolds, or work around unprotected heights and hazardous machinery; she could only occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, or push or pull with her right leg; she could frequently balance; and she could not tolerate concentrated exposure to excessive vibration.  The ALJ found that, with these restrictions, although Plaintiff could not do her past work, she could do the jobs identified by the vocational expert, including clerical sorter, telephone answering server, and final assembler.  The ALJ further found that such jobs existed in significant numbers in the State and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI.  <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises only these issues: (1) the ALJ erred in various ways when he found that Plaintiff did not have a severe mental impairment; (2) the ALJ improperly evaluated the treating physician rule concerning Plaintiff's physical impairments; (3) the ALJ did not properly evaluate either the Listing of Impairments issue or Plaintiff's obesity; and (4) the ALJ did not properly evaluate Plaintiff's credibility.  These issues are evaluated under the following legal standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v.</u>

NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere
scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th
Cir. 1976).  The Commissioner's findings of fact must be based
upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435
(6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th
Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir.
1984).  In determining whether the Commissioner's decision is
supported by substantial evidence, the Court must "'take into
account whatever in the record fairly detracts from its weight.'"
Beavers v. Secretary of Health, Education and Welfare, 577 F.2d
383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB,
340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human
Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court
would reach contrary conclusions of fact, the Commissioner's
decision must be affirmed so long as that determination is
supported by substantial evidence.  Kinsella v. Schweiker, 708
F.2d 1058, 1059 (6th Cir. 1983).

A.  Severe Psychological Impairment

Plaintiff's first argument is that the ALJ erred by finding
that her psychological impairment was not severe.  She points out
that her treating psychiatrist, Dr. Desai, said otherwise, and
that her own testimony indicated that her symptoms got
progressively worse in the latter part of 2011.  Dr. Desai's
treatment notes, particularly those from 2012, document these
increased symptoms.  However, the opinions which the ALJ relied
on did not have the benefit of these records; Dr. Swearingen
examined her before she had seen Dr. Desai, and the second state
agency reviewer, Dr. Edwards, had seen only two of Dr. Desai's
treatment notes, and none after August, 2011.  She contends that
the ALJ simply did not have a sufficient basis on which to
discount completely Dr. Desai's opinion, especially given the
fact that he is a treating source and was the only mental health
professional to evaluate her psychological condition after

-9-

August, 2011.

The ALJ's discussion of this issue appears at Tr. 17.  He noted that Plaintiff's depression was "situational in nature and related to her physical impairments."  He characterized her testimony as attributing all of her restrictions to physical pain and not psychological issues.  He also noted that treatment records showed that various areas of psychological functioning were intact.  Finally, he assigned great weight to the opinions of Drs. Voyten and Edwards, concluding that their opinions were "based on a review of the entirety of the evidence of record" and that they were consistent with "the totality of the evidence." The ALJ acknowledged that Dr. Desai had expressed a contrary opinion, but he gave that opinion "little weight," explaining that "his opinion is inconsistent both with the evidence overall as well as his own personal objective findings" and that there was no evidence to show that, contrary to Dr. Desai's finding, Plaintiff had ever experienced episodes of decompensation.  He also rejected any limits on Plaintiff's ability to concentrate because she was able to play word games with friends, watch television, and read books.

The Commissioner defends this assessment, noting that Plaintiff's GAF score did not change over time, that Dr. Desai's notes do not show any different objective signs after December, 2011, and that the evidence supports the ALJ's finding that Dr. Desai's opinions were contradicted by other evidence of record and his own notes.  In her reply, Plaintiff takes issue with this characterization of the record, arguing that Dr. Desai's notes consistently showed abnormal findings, and that while the ALJ's rationale might arguably support a finding that Plaintiff's depression and anxiety were not themselves disabling, it cannot support a finding that those impairments were non-severe.

Under social security law, a severe impairment or combination of impairments is one which significantly limits the

-10-

physical or mental ability to perform basic work activities.  20 C.F.R. §404.1520(c).  Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting.  20 C.F.R. §404.152l(b).  The question of severity is not related to the plaintiff's age, education, or work experience.  A nonsevere impairment is one which would not be expected to interfere with a plaintiff's ability to work regardless of "whether the claimant was sixty-years old or only twenty-five, whether the claimant had a sixth grade education or a master's degree, whether the claimant was a brain surgeon, a factory worker, or a secretary." Salmi v. Secretary of H.H.S., 774 F.2d 685, 691-92 (6th Cir. 1985).

A plaintiff is not required to establish total disability at this level of the evaluation.  Rather, the severe impairment requirement is a threshold element which a plaintiff must prove in order to establish disability within the meaning of the Act.  Gist v. Secretary of H.H.S., 736 F.2d 352, 357 (6th Cir. 1984); see also Social Security Ruling 86-8 (identifying the question of whether the claimant has a severe impairment as the second step of the sequential evaluation process).  "The claimant's burden to establish that she has a severe impairment at the second step is de minimis." McDaniel v. Astrue, 2011 WL 5913973, *4 (S.D. Ohio Nov. 28, 2011), citing Higgs v. Bowen, 880 F.2d 860, 862 (6th Cir. 1988).  An impairment will be considered nonsevere only if it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience." Farris v. Secretary of H.H.S., 773 F.2d 85, 90 (6th Cir. 1985), citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984).  The

-11-

Commissioner's decision on this issue must be supported by substantial evidence.  Mowery v. Heckler, 771 F.2d 966 (6th Cir. 1985).

Here, Plaintiff's treating psychiatrist, Dr. Desai, expressed an opinion on May 21, 2012, that she not only had a severe mental impairment but that it was disabling.  Leaving aside the second part of that opinion, it is clear that the "treating physician" rule applies to all medical opinions expressed by a treating source, including opinions which would support the finding of a severe impairment.  See, e.g., Black v. Astrue, 472 Fed.Appx. 491 (9th Cir. March 19, 2012); Henderson v. Astrue, 2011 WL 3608164, *2 (E.D. Ky. Aug. 15, 2011)("[a] treating physician's medical opinion and diagnosis should receive substantial deference when considering whether a claimant has shown a severe impairment ...").  This Court has described the rule in this fashion:

> It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. § 404.1527(c); see also Lashley v. Secretary of HHS, 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate

factors in making that decision. <u>Wilson v. Comm'r of Social Security</u>, 378 F.3d 541, 544 (6th Cir. 2004).

<u>Dotson v. Comm'r of Social Security</u>, 2014 WL 6909437, *5 (S.D. Ohio Dec. 8, 2014).  The question then becomes whether the ALJ had, and articulated, good reasons for rejecting Dr. Desai's opinion as to the severity of Plaintiff's mental impairment.

Several of the reasons given by the ALJ for rejecting Dr. Desai's opinions are not supported by the record or are not legally sufficient.  For example, it does not matter whether Plaintiff's depression is situational or related to her physical impairments; what matters is whether it satisfies the legal definition of a severe impairment, and not what has caused it. It is also incorrect to characterize Plaintiff's testimony as attributing all of her problems to her physical impairments; she testified to suicidal thoughts, social isolation, trouble getting out of bed due to depression, and the fact that her doctor had wanted to hospitalize her for psychological reasons.  Further, her statement that she was able to do certain daily activities such as read or play word games is not necessarily inconsistent with a mental impairment that imposes at least some limitation on her functioning.

That leaves two bases for the ALJ's decision: reliance on the opinions of the state agency physicians, and lack of support for Dr. Desai's opinions in his own treatment notes.  As to the former, as the Court has noted, despite the ALJ's statement that the state agency reviewers had the benefit of the entire record, there are notes (and an opinion) from Dr. Desai that post-date the latter of these two opinions.  Further, the opinion of a state agency reviewer, standing alone, is not a sufficient basis on which to disregard the views of a treating source.  <u>Hensley v. Astrue</u>, 573 F.3d 263, 266 (6th Cir.2009).  Consequently, the ALJ's finding as to the severity of Plaintiff's mental impairment

can be sustained only if there is no support for Dr. Desai's opinion on that issue in any of the treatment records cited by the ALJ (Administrative Record Exhibits 11F, 27F, 20F, and 31F).

The first of these exhibits is the evaluation done by Dr. Desai on July 27, 2011. The notes from that evaluation say, among other things, that "signs of moderate depression are present" and that "[s]peech and thinking appear slowed by depressed mood." (Tr. 680). The second, a progress note from April 25, 2012, reports Plaintiff's statement that she was experiencing panic attacks, and Dr. Desai increased her Xanax dosage. (Tr. 911). The third, which is presumably Exhibit 30F (Exhibit 20F is a report of a discogram), is a note from July 18, 2012, in which Plaintiff reported "veg symptoms" and depression to Dr. Desai. At that time, Plaintiff's demeanor was "sad" and "glum" and she appeared to be near tears. Her thought content was depressed. (Tr. 931). The final document relied on by the ALJ is a note from August 15, 2012, which is very similar to the previous note in terms of reported symptoms, and in which Dr. Desai noted a depressed and angry mood and a constricted affect. At each of these appointments, Dr. Desai rated Plaintiff's GAF at 55 and prescribed multiple medications including Prozac, Xanax, Pristiq, and Lamictal. It is simply incorrect to describe these documents as inconsistent with the opinion that Plaintiff had a psychological condition that was severe enough to meet the standards of the Social Security Act. Consequently, the ALJ's determination on the "severe impairment" issue lacked a reasonable basis in the record and did not give sufficient weight to the opinion of her treating psychiatrist. A remand is therefore required to determine the extent of the limitations resulting from this condition, as well as the date on which it became "severe," and to factor those matters into the ALJ's residual functional capacity finding.

## B. Dr. Singh's Opinion

-14-

Next, Plaintiff argues that the ALJ did not give proper weight to the opinion of her treating physician, Dr. Singh, concerning the severity of her back disorder and associated symptoms. She asserts that the ALJ, in his explanation of why Dr. Singh's opinion was given little weight, "overgeneralized" by failing to identify what other parts of the record allegedly contradicted or did not support his views, and that he mischaracterized the evidence about how well Plaintiff was able to drive, do household chores, or walk.

The ALJ had this to say about Dr. Singh's opinion:

> I have given little weight to the opinion of Dr. Singh, the claimant's primary care physician .... Despite Dr. Singh's longitudinal relationship with the claimant, Dr. Singh is not a specialist in orthopedics or neurology. Further, his opinion is inconsistent with the totality of the evidence, specifically, his own objective findings as well as findings that the claimant is able to ambulate without a cane, she can drive, and she can complete her household chores. Therefore, I have given his opinion little weight.

(Tr. 21).

That statement must be viewed in the context of the ALJ's discussion of other evidence relating to Plaintiff's physical condition. He gave "some weight" to Dr. McCloud's opinion that Plaintiff could do a relatively full range of light work, as well as some weight to Dr. Freihofner's more restrictive views, noting that they are "based on the objective medical evidence and are consistent with the totality of the evidence." Id. He modified those opinions, however, based on giving partial weight to Plaintiff's testimony. Lastly, he did not assign any weight to Dr. Brown's consultative examination and opinion, noting that it did not provide any meaningful vocationally relevant limitations. The Commissioner argues that Dr. Singh's opinion was generally susceptible to discounting because he incorrectly stated that Plaintiff needed a cane, because the limitations he imposed were more restrictive than Plaintiff's own testimony about her

-15-

physical abilities, and because Dr. Singh's notes do not mention any specific, objective abnormalities. Also, the Commissioner asserts that the ALJ was entitled to factor into his evaluation Dr. Singh's lack of specialization in the fields of orthopedics or neurology. The Court reviews the ALJ's decision on this issue under the same "treating physician" standards that are set forth above.

The two most significant reasons given by the ALJ for discounting Dr. Singh's opinion are that it was not supported by his own findings, and that it was inconsistent with Plaintiff's own testimony. Taking these factors in reverse order, the ALJ pointed to three things Plaintiff said that were not consistent with Dr. Singh's very restrictive view of her capabilities: that she was able to walk without her cane, to drive, and to do household chores. Plaintiff's actual testimony on these points was that without a cane, she was susceptible to falls, and that the only place she did not use it was inside her home, where she could grab onto something if she lost her balance. She said she could drive but it was very painful, and that she could not persist at any household chore for more than five minutes; vacuuming was done one room at a time, and she needed to lie down after she finished. Any inconsistencies between this testimony and Dr. Singh's findings are so inconsequential as to be virtually meaningless. Thus, this part of the ALJ's rationale is not supported by the record.

That leaves the ALJ's interpretation of Dr. Singh's findings. The ALJ did not specify which of those findings he thought supported a more generous residual functional capacity. In fact, his decision makes no reference at all to Ex. 13F, which is comprised of 118 pages of Dr. Singh's notes. It is not the Court's task to scour these records for evidence that supports the ALJ's decision. One of the primary reasons for the "articulation requirement" set forth in §404.1527(c) is to allow

-16-

for "meaningful review of the ALJ's application of the [treating physician] rule." Wilson, 378 F.3d at 544. Given the nature of this record and the ALJ's non-specific reference to findings that are scattered throughout the evidence, that meaningful review is not possible here. On remand, the ALJ should also provide a more detailed explanation of the bases for rejecting Dr. Singh's opinion (if that is the ultimate result), making sure that the record actually supports any reasons articulated for discounting that opinion.

C. <u>The Listings and Obesity</u>

Plaintiff's third claimed error is that the ALJ did not specify which sections of the Listing of Impairments were considered and that the state agency reviewers did not appear to take her obesity into account in determining if any of her conditions equaled an impairment described in the Listing. She concludes that "the ALJ's failure to explain his findings and to evaluate obesity cannot be harmless error." Statement of Errors, Doc. 14, at 20. The Commissioner counters that the ALJ made several references to Plaintiff's obesity and to how it limited her functioning, and that she has not pointed out any additional limitations which are supported by the record and which the ALJ did not take into account.

These are actually two separate issues. The first deals with how the ALJ explained his decision about whether Plaintiff's impairments - which the ALJ determined to be degenerative disc disease of the spine and obesity - satisfied the requirements of any section of the Listing of Impairments. The second (particularly as Plaintiff describes it in her reply) is whether the ALJ adequately articulated his decision about the impact, if any, of Plaintiff's obesity on her physical functioning, and whether the ALJ complied with Social Security Ruling (SSR) 02-1p.

The ALJ did not specifically identify any section of the Listing when performing his step three analysis, concluding only

-17-

that the record did not establish the existence of an impairment of Listing severity and that "no medical expert has opined that the claimant's impairments equal any of the listings." (Tr. 18). Plaintiff points to various findings in the record that would satisfy most of the requirement of Section 1.04, noting that only motor loss has not been documented, and argues that the ALJ's failure to refer to this section or to make a determination of medical equivalency is error.

Contrary to Plaintiff's suggestion, there is no requirement that the ALJ provide any specific level of articulation about the step three analysis. See Bledsoe v. Barnhart, 165 Fed.Appx. 408, 411 (6th Cir. Jan. 31, 2006)(noting that the "argument that the ALJ should spell out the weight he gave to each factor in his step three analysis is not supported by case law"); Lee v. Comm'r of Social Security, 2013 WL 6116814, *7 (N.D. Ohio Nov, 20, 2013)("The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis"). Further, at step three, the claimant has the burden of showing that he or she has an impairment of Listing severity; "[t]he burden of proof for establishing that an impairment meets or equals the requirements of a listed impairment rests with the claimant." Miller v. Comm'r of Social Security, 848 F.Supp.2d 694, 708 (E.D. Mich. 2011), citing Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001). Given the ALJ's overall discussion of the medical evidence concerning Plaintiff's back disorder and the fact that he made a step three finding, the Court cannot find reversible error from the lack of a more detailed discussion of the requirements of Listing 1.04.

The other branch of this argument relates to the requirements of SSR 02-1p. That ruling describes at what stages of the decisional process obesity is considered. The portion which Plaintiff claims was not followed in this case is found n Section 8 of the Ruling, entitled "How Do We Evaluate Obesity in

-18-

Assessing Residual Functional Capacity in Adults and Functional Equivalence in Children?"  The last sentence says this: "As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations."

Plaintiff appears to contend that this Ruling creates an articulation requirement similar to the one contained in 20 C.F.R. §404.1527(c), the "treating physician" rule.  See Rogers v. Comm'r of Social Security, 486 F.3d 234, 242 (6th Cir. 2007).  She has not identified any case which so holds, however, and the courts have been reluctant to elevate these types of procedural requirements to the status of standards which call for almost automatic reversal when not strictly followed.  See Rabbers v. Comm'r of Social Security, 582 F.3d 647 (6th Cir. 2009).  In contrast, the Court of Appeals has said that "[i]t is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants."  Bledsoe v. Barnhart, 2006 WL 229795, *3 (6th Cir. Jan.31, 2006).  Given that to be true, it is clear in this case that the ALJ was aware of Plaintiff's obesity - he found it to be a severe impairment - and Plaintiff has not pointed to any specific functional limitations caused by her obesity which, in her view, the ALJ simply disregarded.  Consequently, the ALJ's error, if any, was harmless.

D.  The Credibility Determination

Finally, as her fourth claim of error, Plaintiff argues that the ALJ failed to consider all of the credibility factors listed in SSR 96-7p.  She also contends that the reasons he cited for discounting her credibility do not support his finding, particularly the evidence concerning her use of a cane and her ability to drive.  According to Plaintiff, the overwhelming weight of the evidence on the relevant factors, including her aggressive pursuit of treatment and the testimony about the side

effects of her medication, support a finding that her description of her limitations was entirely believable.  The Commissioner responds that the inconsistencies noted by the ALJ are supported by the record, that Plaintiff's course of treatment was conservative and not aggressive, and that the Court should defer to the ALJ's findings based on the ALJ's superior ability to view the witness and evaluate her testimony.

The ALJ did not actually provide a specific rationale for finding Plaintiff to be less than credible, other than several general statements to the effect that her testimony was rejected to the extent that it conflicted with the ALJ's residual functional capacity finding and that she could not have been disabled based on "the evidence of record" (Tr. 21) and the "longitudinal evidence of record...." (Tr. 19).  Obliquely, the ALJ appeared to find that Plaintiff's testimony was not supported by the objective medical evidence.  This entirely conclusory analysis of credibility (as opposed to the analysis of the medical evidence itself), which does not appear to have accounted in any way for her testimony about psychological symptoms, does not provide enough detail for the Court to determine if the ALJ's reasoning process was supported by substantial evidence.  On remand, the ALJ will have the opportunity to make a credibility finding more in line with the requirements of 20 C.F.R. §404.1529(c)(3), as interpreted in cases such as Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994) and Patterson v. Comm'r of Social Security, 2012 WL 1028879, *7 (N.D. Ohio March 26, 2012) (an ALJ is "required to supply at least some explanation to make clear the grounds upon which he judged [the claimant]'s credibility").

VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner for further proceedings

-20-

pursuant to 42 U.S.C. §405(g), sentence four.

VIII.   Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge

-21-